The Honorable Judges of the United States Court of Appeals in and forth the Senate Judicial Circuit. Hear ye! Hear ye! Hear ye! All persons having business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. Good morning, ladies and gentlemen. Our first case for argument this morning is Brown v. LaVoie. Ms. Clark. Good morning, and may it please the Court. My name is Madeline Clark, and I represent the appellant, Victor Brown. Victor Brown presented in the Medical Health Unit with a 2-inch screw lodged in his arm. Faced with a serious medical need, Dr. LaVoie inflicted additional pain. He rooted around in Brown's unanesthetized arm for five minutes while making harsh and dismissive comments, indicating that Brown deserved to suffer. Dr. LaVoie ultimately stopped, not because the procedure was successful, but because Mr. Brown was in so much pain that he demanded that Dr. LaVoie stop. When taken to the hospital, the medical staff administered local anesthesia and removed the screw in under three minutes. As this Court's precedents make clear, this evidence was sufficient to allow a jury to infer that Dr. LaVoie based his treatment decisions on personal hostility and not medical judgment. Do we have to agree with your characterizations of the conversation between Dr. LaVoie and Mr. Brown in order to reach that conclusion? You don't have to agree with my characterizations, but I think you have to acknowledge that a jury could infer from those conversations that there was animus. I think there's also other evidence in the record from which this Court could infer that Dr. LaVoie was not exercising medical judgment, in addition to the content of the statements and the tone. What other evidence? The inherent painfulness of the procedure, that Dr. LaVoie has provided no explanation for why he went about it in that way. What's his obligation to provide an explanation? I do not think Dr. LaVoie necessarily has an obligation to provide an explanation, but on summary judgment, he had a burden to establish that there was no dispute of material fact. And in light of the comments, the inherent pain of the procedure as evidenced by the video and my client's testimony, and the later comparison to what happened at the hospital, in that full context, a jury could look at what happened, and particularly given that there was no explanation, infer that Dr. LaVoie was not exercising medical judgment. I'm just curious here, what he doesn't yank the screw out, and clearly it was a painful procedure. He looks to see if he can get the screw out, and then he sends him to the hospital. We don't know why he sends him to the hospital, but we suspect he sent him to the hospital to have the screw removed. I believe he... Go ahead, I'm sorry. I'm sorry. I believe he sent him to the hospital because Mr. Brown revoked consent and no longer had given Dr. LaVoie consent to perform the procedure. And the reason that my client revoked consent was because of the extreme pain that he was in. The weird thing is, we don't know why he didn't use anesthesia, right? We just don't know. I mean, he doesn't say, but the question is, do we infer medical judgment or a medical reason for not doing so? Of course. We don't know why he didn't use anesthesia, and that's exactly the point. This court's precedents make clear... But there are a lot of cases, particularly in the Eighth Amendment context in the prison, where we don't know why a doctor chooses a particular path to a procedure, right? We don't know why he didn't use anesthesia to pull the screw out, and clearly, I would think that he would look at the screw and at least see what he had in front of him before he gives Mr. Brown anesthesia. He might, and that could be one read of the record, but another read of the record is that he did not use anesthesia, and he went about the procedure the way he did because he had animus or personal hostility towards Mr. Brown. So, can I ask the significance, I mean, in a sense, we're talking about two different points in time. One, we're talking about Dr. Lavoie's initial decision to see if he can pull out the screw, screws being, you know, screws. They're not clean things like a splinter or a nail or something else you might be able to pull out. But there's that initial decision, but then there's the five minutes during which Mr. Brown is screaming in pain, and so I'm interested in the extent to which we're looking at the persistence in a course of conduct that is causing extreme pain, as opposed to simply the initial decision to see if maybe the screw will pop right out. I think both are relevant to the deliberate indifference analysis. I think a jury could infer, based on the later comments, that the initial decision was based in personal hostility, and even if perhaps that was not sufficient for the jury, I think the jury could also look at what happened during the second procedure, where a minute and a half into the procedure, Brown started screaming out in pain. It was clear that it wasn't working, and yet the doctor continued and persisted in the procedure. I think all of that is contextual evidence from which a jury could infer that Dr. Lavoie was not exercising medical judgment. And here, that's particularly important. This court's cases make clear that the relevance of medical judgment in this context is that where a doctor is exercising medical judgment, the doctor, by definition, cannot be deliberately indifferent. But when there's evidence in the record from which a jury could find that the doctor was not exercising medical judgment, we're in the realm of deliberate indifference. We're in the realm of a state actor inflicting pain on a prisoner without justification. That is the relevance of this court's holdings in Gill, Rivera, and Rasho. And I think those holdings, and I think those cases, dictate the same outcome here, which is that this case should have gone to a jury. Can I ask you this question? We don't know very much about the details of the way the people at the hospital eventually address this. But what we do know is that they were told to avoid conventional stitches. I mean, it seems like one thing you could do is just make an incision and then pull the thing out. But Brown had a history of being uncooperative, self-harming, et cetera. Is that of any relevance here when we look at the way Dr. Lavoie decided to proceed? I think it could be of relevance to the extent that it bears on whether Dr. Lavoie was exercising medical judgment and the way in which he removed the screw. It could bear on the fact. It's additional evidence that Dr. Lavoie knew that Brown had a history of self-harm. That's something he knew before he began the procedure, and that's part of the evidence that he might have made a decision to inflict pain or teach Brown a lesson. And so I think to that extent it's relevant. And the record does include some indications that the screw was shoved far enough into Brown's flesh that it wasn't even visible all the time. The nurse makes some remark about when you wiggled it around you could get glimpses of it, but it wasn't really out there. Right. The record reflects that the screw was visible with manipulation, but it was lodged deeply enough in Mr. Brown's arm that it was, as evidenced by the record, not visible to the naked eye. It is far from a surface-level injury like a splinter that could have been removed quickly. It was a two-inch screw lodged so deeply in my client's arm that it could not be seen. And I think that is part of what bears on what a jury could look at when it's considering was Dr. Lavoie exercising medical judgment here or was something else motivating Dr. Lavoie's actions. Let's talk for a minute about qualified immunity. How closely do we need to find analogous cases? I'm hoping that there aren't too many cases in the United States where screws are shoved into somebody's arm and this all happens. Is this one of those cases that's just so plainly designed to inflict pain as opposed to provide medical care that you don't need to find a perfect match, or is this something where we need to work through all the various cases of medical care and prisons, which are legion? I think it's the former. This Supreme Court's case law also establishes that the question is whether the principle has been implied in a specific enough factual context to give the doctor notice. So there are some deliberate indifference cases where the court needs to find a medical procedure that is more on point with what happened. That would be the case if this were an appeal where Mr. Brown were trying to prove that Dr. Lavoie should have known what he did was wrong because no doctor would have performed this treatment. In such an instance, you would need an analogous case. But where the argument here is more direct, it is that Dr. Lavoie intentionally inflicted punishment based on personal hostility to teach a lesson or from some other reason. That principle is clear enough from the court's case law without there needing to be an analogous case. So that's where you're relying on the statements that a jury could read those statements one way or the other way. I mean, Dr. Lavoie could convince a jury, I presume, that he was doing the best he could. Yes, he could. But a jury could read them the other way. And that puts this case in line with Gil, Rivera, and Rasho, which should have put Dr. Lavoie on notice that intent to punish or teach a lesson is not a permissible basis for treatment. What's the evidence in the record regarding that he's got a two-inch screw in his arm? What's the evidence in the record as to when Dr. Lavoie learned as to the particular piece that was in his arm? Do you know when Dr. Lavoie learns that? Based on Dr. Lavoie's declaration, I believe he learns that before he comes into the first treatment room for treatment. That might be. I knew he knew he had a screw in his arm, but I didn't know if he knew that the two-inch screw is different than if you have a little quarter-inch screw or something like that. Right. See, it's as if the declaration had inserted a screw into his arm and asking if I would attempt to remove it. Right. And so then, so he knew he had a screw in his arm. And then if you watch the video, what happens is Dr. Lavoie enters the first treatment room. I believe he then examines my client's arm and then goes to get the materials. And at that point, my client asks, are you going to use anesthesia? So at that point, Dr. Lavoie would have seen the arm and seen that the screw was embedded so deeply that he couldn't, in fact, see it. Did he say there's a bulge or something? There's something that indicates the screw's in there. Well, the nurse had told him there was a screw in the arm. And so there is no question that Dr. Lavoie based on his own definition. But the bulge would also give you, to Judge Kirsch's point, some notion of whether it was just some little tack or whether it was... I guess they knew that he had broken the mirror. He had actually swallowed some things, but the kind of screw that was holding the mirror up is the relevant screw. Right. And he would have been able to see from the bulge in the arm, you're right, the length of the screw. And in any event, it would have been obvious from a cursory glance at it that the screw was so large that it was still embedded in the arm and unable to be seen. I will also note that we also asked this court to reverse the district court's decision with respect to the appointment of counsel. And if there are no further questions on that or any other issue, then I will rest on the briefs and yield the rest of my time. Thank you, Ms. Clark. Thank you. Ms. Schmelzer. Good morning, Your Honors, and may it please the court, I'm Jody Schmelzer, an Assistant Attorney General with the State of Wisconsin Department of Justice, and I represent Dr. Lavoie. I'm going to start off by addressing the Eighth Amendment claim here against Dr. Lavoie and point out, I think, what's been overlooked so far in this argument, which is what Mr. Brown is arguing here is that we have to look for the deliberate and different analysis at this discreet conduct that's part of a treatment decision that in and of itself has not been challenged by Mr. Brown, the decision to remove the screw from the arm. The screw had to be removed from the arm. That's the course of treatment here, and what's being challenged is this sliver, this parsing out this decision not to use anesthetic in an attempt to do that. But, you know, that's the elephant in the room, though, right? I mean, so if, you know, to take a different example, if I went to a dentist's office and I needed to have root canal work done and the dentist just decided, well, I'm just going to do this without any anesthesia, that would be a very different experience from what you would expect a normal dentist would do, which would be to deaden the area. The dentist could easily do it without anesthesia. So it's really about the anesthesia. Your Honor, I would disagree with that here because we do have a case from this court, the Snipes v. Detelicase, that says doctors are not obligated to provide the least painful treatment for inmates. But they're not all… Snipes doesn't say they get to do the most painful treatment possible. I mean, I think you're… I know you rely on Snipes in your brief, but I think that the facts there are quite different. That's a local anesthesia to remove a toenail, and we describe this as a minor medical decision, something that didn't signify any kind of deliberate indifference. We don't have the conversation. We have the actual procedure being quite different than rooting around in somebody's arm for five minutes with no anesthesia, turning it into hamburger. I don't know that that's in the record, Your Honor, that he turned the arm into hamburger. Well, just that little area. I mean, you're… That's… It's in muscle, right? It's not in the bone. It's in muscle. It's in there. Definitely, it's in there. It's visible by manipulation. And what Dr. LaVoie did, indisputably, was try to remove that for five minutes. After believing that Mr. Brown gave consent for that, and stopping… As Mr. Brown screams in pain. Screams in pain, takes a break, proceeds to try and remove the screw. And when Mr. Brown says, stop, I'm refusing, within seconds, Dr. LaVoie stops and then sends him to the hospital, consistent with that course of treatment, to remove the screw from his arm. With anesthesia, yeah. I really have trouble dissecting out the anesthesia part, since it seems like that's what the whole case is about. If he had initially sent Mr. Brown to the hospital, or initially, maybe… See, what's missing in this record? It's Dr. LaVoie who wants some re-judgment in his favor. So he has to, in some ways, show that he deserves that. And we don't have any evidence in this record that this was a routine way of dealing with self-harm. We don't have any evidence in this record that the prison medical clinic lacked any Maybe if there was nothing there, he was just doing the best he could, but none of that is there. We just have this man screaming in pain, and the doctor continuing, not stopping, but continuing to inflict this tremendous pain, along with this exchange of, you know, along with the commentary that he's offering. He did stop within seconds after Mr. Brown refused and said, I'm revoking my consent, I want to stop. Well, but let's focus on the five minutes while he's doing it. This is the five minutes of your root canal that the doctor's pulling nerves out of your teeth. And I would submit, Your Honor, that in Snipes, it tells us that we can't dissect the decision to administer local anesthetic with the coarser treatment here, which is… When it's a toenail, I mean, when it's a minor medical decision, that's what Snipes is about. I don't think, you know, pulling for five minutes can rationally be considered a minor medical decision. And believe me, if this were the other way around, and the state were saying, oh, you know, you have to have a perfect factual match, Snipes is not a perfect factual match. And I would submit, Your Honor, that at the summary judgment stage, it would have been nice to have all that evidence in the record. We probably wouldn't be here today if it were. But I don't think it's necessary for this Court to affirm summary judgment for Dr. Lavoie. But why isn't there at least a disputed issue of material fact on the elements of an Eighth Amendment claim? Number one, nobody seems to be worried about whether this was a serious medical problem, so that's done. Was the coarser treatment that Dr. Lavoie adopted something that a rational jury could find reflected deliberate indifference to the pain that was being inflicted? Was it being, in a sense, done as punishment, which is what the Eighth Amendment talks about, rather than the provision of medical care? I'm not saying a jury would have to find that. Not at all. But if a genuine issue of fact has been presented, then you need to let the jury decide the case. You can't decide it on summary judgment. We take all the facts and reasonable inferences in Mr. Brown's favor. And I think given that here, Your Honor, and it's not just Snipes that tells us we can't parse out this discreet conduct in a course of treatment and look just at the deliberate indifference as to that discreet conduct. Gutierrez, another case I cited in my brief, says you look at the entire course of conduct. And looking at that entire course of conduct here, we have an inmate who Dr. Lavoie believes consented to try and get this removed. He knew anesthetic wasn't going to be used. Presumably he consented to a normal medical procedure. There must be some medical literature on the normal way to treat this kind of injury. And I can imagine literature that says, step one, anesthetize the patient. Step two, reach in with forceps. Or I can imagine literature that says, it's kind of like setting a bone. One yank is the right thing to do. Use anesthesia only if that doesn't work. Is there any literature? Certainly the parties haven't referred to any. Have you looked and found any? I have not, Your Honor. On information and belief, I don't know that that's always true. It's my best defense, it seems to me, that the normal way to treat something like this in the literature, taught in med school, you name it, the normal way to do this is to see if you can yank it out and then use anesthesia later. But without any explanation from Lavoie, and without any attempt by his counsel to provide medical support, it is, as Judge Wood says, awfully hard to see why we don't have a jury question. Dr. Lavoie's treatment decision here to have the scar removed is presumed valid. And on summary, it's not blatantly inappropriate. Well, I know it is blatantly inappropriate. If you look at the medical literature, it's going to tell you, this is an egregiously inappropriate treatment. Or it might say, this is the starting point, use anesthesia later. But you haven't looked. Apparently nobody has looked. I have no idea what the medical profession thinks is an egregiously inappropriate treatment for this kind of problem. That's our problem. That's my problem, anyway. Your Honor, and I would submit that if this is an egregiously inappropriate behavior, it should have been established by clearly established, closely analogous case law here. And what we have is snipes. Appropriate medical procedures are established by the medical profession, not by case law. That's what I find surprising about the litigation of this case. Nobody seems to have turned to the medical literature to find out what people like Lavoie  But what we have in snipes is this court saying, look, to remove a toenail, a prison doctor doesn't need to use anesthetic. It doesn't even implicate the Eighth Amendment. But that's a toenail. For one thing, that's a toenail. For another thing, it's maybe there should have been some literature there, too. I mean, I assume that you would agree if somebody needed to have their big toe amputated that it would be egregiously inappropriate to do that without anesthesia. And sometimes people do need that sort of treatment. Different things happen, and maybe it's getting gangrenous or something, who knows what. So we just have a record here that, taken in the light most favorable to Mr. Do, a rational jury could find that this was out of bounds. Now, I would imagine at a full trial, maybe you'd be introducing the kind of literature that Judge Easterbrook's talking about. If it exists. If it exists. But I don't see how this gets you over the hurdle here, given what the doctor is observing is an individual who is in extreme pain the whole time it's going on. It's not like the bone where you go snap, snap, put it back together again, and it hurts like the dickens while that's happening. But then it's over. I don't know if that's ever happened to you, but that's what they do. It happened to somebody I know, actually. So I know it really hurts when it's happening, but it's very brief. But this is different because screws, of course, whether they're being put in wood or they're being put in flesh, are designed to be hard to take out, right? That's why they have the spiraling, whatever it's called. There's some special word for that, but they're hard to take out. And I would submit, Your Honor, looking at the whole of the treatment here, Dr. LaVoy proceeding, believing he had the consent to do so, him stopping within seconds of that being revoked, and the decision to try to do this without anesthetic and before sending him out to the hospital was not blatantly inappropriate. But Mr. Brown asks several times for anesthesia. At what point can we infer medical judgment? Let's say Mr. Brown was getting his teeth cleaned, and he said, I have extremely sensitive gums and I want you to use anesthesia. Clearly the doctor would say, absolutely not, right? You may put some topical cream on there or something, but he would not, I want you to put me to sleep. I want you to put me to sleep to clean my teeth. The doctor would say, no. And we would infer that the doctor was using medical judgment, even if they had a somewhat nasty conversation. At what point should we infer that the doctor was using medical judgment by not using anesthesia? Here's what I'm concerned that will happen. We will send this case back to the district court, and there will be a directed verdict after the doctor testifies and says, this is exactly why I would not use anesthesia in the prison context in this situation before determining the severity of what I was looking at. And that's what I was doing with what is clearly, you can watch the video for 15 seconds and you determine he's a very difficult patient in a difficult setting. At what point do we infer that the doctor was using medical judgment as to just imposing some barbaric treatment that the Eighth Amendment prevents? I think we infer from the beginning it's a doctor's decision and it's presumed valid. And it was Mr. Brown's burden to show that that was such a substantial departure from exercise of medical judgment at all. And if he doesn't do that in the first instance, then Dr. Lavoie does not have to come back with evidence and say, no, no, no, it was. You can imagine a situation like I described with the teeth cleaning, that it can't just be that the plaintiff's obligation is to say, I asked for anesthetic and he didn't use it. And now the doctor has to come and defend that by saying, no, no, no, here's how I exercise medical judgment. Here's why I've exercised medical judgment. That's exactly right. But aren't there situations, though, I mean, certainly it can't just be that the patient wants medication. But if instead of the teeth being cleaned, there's a tooth being extracted, at that point we begin to enter the realm where common sense tells you that some kind of deadening or a root canal where the nerve in the tooth is removed, that's a very painful procedure. And so standard of care, if you will, which I know isn't the same thing as the Eighth Amendment, but this is a thing for which people get anesthesia. There are all sorts of other procedures. If you're having your gallbladder removed, laparoscopically, they don't just cut open and pull it out, there's anesthesia. So there are all kinds of things where, could you do it without anesthesia? Sure. You could amputate the big toe without anesthesia, too, but here we have this grinding around in the arm, and maybe not just at the first moment, but as soon as Dr. LaVoy realizes the thing isn't just slipping right out. That's why I was interested to begin with at kind of stage one, stage two, the initial decision to try it without anesthesia and the decision to persist. An over Brown's repeated pleas for anesthesia and cries of pain. And I would submit if that's legal uncertainty that we're talking about, qualified immunity applies and Snipes establishes that legal uncertainty here. What? Okay. I don't see that. I see my time is up. That's fine. Thank you. Thank you, Ms. Schmidl. Anything further, Ms. Clark? This court's precedents established that whether a doctor exercised medical judgment is integral to the deliberate indifference inquiry in the medical context. Can I ask you a question, Ms. Clark? Can we infer medical judgment from the fact that when Brown revoked his consent, the doctor sent him to the hospital to have anesthesia applied and remove the screw? Clearly, this screw was coming out. I get the idea of consent, okay, and he stopped, he consented, or he said, stop, stop, stop. The doctor stops and sends him to the hospital where local anesthetic is done and the screw is removed. Can we infer medical judgment from the fact that Dr. Lavoie stopped and send him to the hospital? Perhaps you could infer medical judgment, but I think the relevant point here is that there would still be other evidence from which it could be inferred that there was no medical judgment. For example- I would agree with you if he yanked the screw out. But the question is, is this such barbaric treatment, the procedure that occurred, poking around in his arm to determine whether he could remove the screw without anesthesia? And then, he did administer the anesthesia himself. He sent him, for some reason, he sent him to the hospital to have the anesthesia removed or whatever to have the screw removed. Can we infer medical judgment from the course of treatment, from the start of the procedure to the end? I think there could be multiple inferences that could be drawn from the record. One could be, as you're saying, that he was exercising medical judgment. Another could be that he was intentionally inflicting pain and then when consent was revoked, he had to stop and send him to the hospital. Where do we draw the line? You know, this makes me real nervous as to where do we draw the line. The procedure didn't end here. I mean, if a doctor had a, let's say a patient comes in with gallbladder pain, okay, and the doctor is trying to determine the source of the pain, and so the doctor does a physical exam and presses and applies pressure on the patient's midsection and causes extreme pain because of the gallbladder issues. And then the doctor says, stop. You've got to go to the hospital and have your gallbladder taken out. Can that patient sue the doctor and say, well, I came in and said I'm having extreme abdominal pain and instead of sending me immediately to the hospital, you pressed on my belly and for 30 seconds you created extraordinary pain to punish me because I wanted to go to the hospital. And therefore, it's an Eighth Amendment violation. I think that would be a very difficult claim for the plaintiff because- Why? Why? Why wouldn't they just start Brown versus Lavoie and say, look- Because Brown versus Lavoie also has additional context. Brown versus Lavoie also has the comments that Dr. Lavoie made to my client. And also- Can I just say, I mean, if it were immediate like that, that would be one thing. But what happens, according to the record in this case, is after Mr. Brown is begging Dr. Lavoie to stop, he takes the tool out of his flesh. He says, you know what? It can stay here. That's fine. He wipes the blood off. He leaves the room. Four hours go by. We don't have Dr. Lavoie just saying, gee, you know, I thought I was going to be able to do it this way, but it's not working. Four hours go by and then they send him. And we don't even know what Dr. Lavoie's role is in the decision to send him to St. Vincent's. But that's what happens. Right. That is the case. And I do not think that this case is breaking any new ground. I think this case is exactly in line with Gil, Rivera, and Rasho. Gil actually looks at one isolated instance of allegedly intentional misconduct in an overall course of treatment and holds that that one isolated instance of misconduct could serve as the basis for a deliberate indifference claim. And so I don't think that this case is breaking any new ground on that point. I would ask that this court reverse. Thank you. Thank you, Ms. Clark. And Ms. Clark, we appreciate your willingness and that of your law firm to accept the court's request in this case to represent Mr. Brown. The case is taken under advisement.